**No. 61052.**—Henry C. Schaerf Corp. *v.* United States, protest 239413–K (New York).

FORD, Judge: The suit listed above challenges the action of the collector of customs at New York in classifying certain merchandise as manufactures of metal, not specially provided for, with the consequent levy of duty thereon at the rate of 22½ percent ad valorem under paragraph 397 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802. Plaintiff claims said merchandise to be properly dutiable at 12½ percent ad valorem under paragraph 345 of said act, as modified, *supra*. The modified paragraph, under which claim is made, reads as follows:

Saddlery and harness hardware: Buckles, rings, snaps, bits, swivels, and all other articles of iron, steel, brass, composition, or other metal, commonly or commercially known as harness hardware; and all articles of iron, steel, brass, composition, or other metal, commonly or commercially known as saddlery or riding bridle hardware; all the foregoing:

If not plated with gold or silver_____12½% ad val.

Two samples of the involved merchandise were admitted in evidence and marked collective exhibit 1. Also, there was admitted in evidence and marked exhibit 2 a catalog of North & Judd Manufacturing Co., the flyleaf of which bears the following: "Copyright 1933 North & Judd Manufacturing Co. New Britain, Conn." Another catalog was also admitted in evidence and marked exhibit A. This last exhibit bears no date of its publication. The only evidence we have as to the date this catalog was in use is the statement of counsel for the defendant to the effect that he wrote and asked for a catalog prior to 1930 and that he presumed this one was prior to that date.

Two witnesses testified for the plaintiff and one for the defendant. The first witness had been in the wholesale hardware business for 30 years, and, during said time, the witness had bought and sold merchandise like collective exhibit 1 fairly constantly. He testified that collective exhibit 1 had been known as harness snaps; that his firm has customers in every state of the Union; that his firm finds that this article sells best through the farming sections of the country; that if he has seen horses with harness on them he has seen these snaps on their harness. However, when asked, on cross-examination, on what part of the harness he had seen articles like collective exhibit 1 used, he stated:

I have seen them on harnesses. I am not a farm boy. I am a city boy and all I can say is that I have seen them on harnesses, I believe as well as you have.

\* \* \* \* \* \* \*

Technically I don't know. \* \* \* I couldn't technically describe it to you. It is used somewhere at the end of a line but to give you the technical terms, I couldn't tell you.

Plaintiff's second witness was president of the importing corporation and had been in the same line of business for 19 years in the United States and abroad. He stated that he had sold merchandise like that here involved in the middle West and East; that "This is called in this country and also from the other side as I can show from the invoices, I got there, a horse harness snap or a saddlery snap." The witness was interrogated and answered as follows:

Q. Now, based on your experience from having seen that article in use, would you say that it is suitable for use on harnesses or in connection with a horse, hitching him up to wagons or farm implements?—A. It is. It also can be used on a horse for leading him around the track.

\* \* \* \* \* \* \*

X Q. Can you tell us, Mr. Witness, what other part of harness equipment that is used on besides the bit that you spoke of before?—A. It can be used on a saddle. There's a part on the saddle where the bag is; it can be used under the bag with a little hook to hang up for instance equipment for the cowboy or something like that \* \* \* .

X Q. That particular item wouldn't be used that way?—A. I have seen these here used mainly, I have seen them on the horse itself. They come over here, on the bit, on both sides.

When asked in what part of the country he found the greatest market for this merchandise, the witness stated:

As far as I know, I sell to jobbers mostly, but as far as my experience goes, they are sold mostly in farmers' market, county seats, in farmers' territory. They are not used in the city. For instance, in New York, I don't sell these.

Neither of plaintiff's witnesses appeared to be very familiar with the use of the subject merchandise. While both witnesses stated that the subject merchandise was used on the harness of a horse, neither was able to give any convincing testimony that would support that statement. Defendant's witness denied all the statements made by plaintiff's two witnesses. Referring to the hardware trade, with which he was quite familiar, he stated: "We consider that a swivel eye bolt snap." When asked to state how he had seen collective exhibit 1 used, he stated:

I have seen these snaps used on dog leashes; I have seen them used on flag halyards; I have seen them used in marine applications; I have seen them used for stall guards in stables; I have seen them used on chains as in airports, making a line or division for entry through a ticket checking proposition. Years ago, we used to sell many many of these particular snaps to the Interboro Transit Company for guards between the cars. I have seen these snaps used many times as a tie-out chain, a tethering chain and there are in addition to that, many additional applications where these are used with pulley blocks and so forth.

The witness also testified that the instant merchandise is swivel snaps. "That is a very important distinction." He also testified that he had never seen these snaps used on horse harness and that a good portion of these snaps had gone into the manufacture of heavy dog leashes. "In equipping a horse to draw a load, there is no application for this snap that I am familiar with; there is no possible application that I can think of; there is no strap on a harness that will fit that or this snap."

When the witness was asked to state what the chief use of the subject merchandise has been and is, he testified as follows:

It would be a very difficult thing to attempt to place any chief use on it because of the multiplicity of applications that occur with this snap, which is a utility proposition. A good portion of the production of these snaps has gone into the manufacture of heavy dog leashes.

\* \* \* \* \* \* \* \*

JUDGE FORD: You say that Exhibit 1 has never been used on a harness to your knowledge?

THE WITNESS: No, sir. There are items very similar in appearance that are used on a harness. I call attention to the fact that they are swivelry. If this were looped in contrast to being round, it would be used as a rein snap. \* \* \* There is no way that this could be used with a rein snap but a rein snap is not a swivel snap. The nearest approach is where cotton reins are sometimes used, but never with a swivel snap because it is expensive. It is a fast eye snap. There is no place on a harness that I am familiar with that this can be put on the harness itself. It can be used on a halter lead chain or rope when it is snapped into the square of a halter. \* \* \*

With regard to the two catalogs in evidence, we are in agreement with the following statement by the Court of Customs and Patent Appeals in *United States* v. *Sheep Shearers Mdse. & Comm. Co.*, 23 C. C. P. A. (Customs )146, T. D. 48009:

We are of the opinion that if this catalogue, and other catalogues introduced, referred to the articles at bar as "combs" and "cutters", on and prior to the enactment of the Tariff Act of 1922, and that these catalogues were thoroughly circulated throughout the United States, this fact, though competent, could not constitute satisfactory proof of commercial designation, because, for one reason, it appears in this record that the trade did not uniformly accept such terms and continued to designate the articles by other names. It surely cannot be logically contended that a dealer in a given kind of merchandise can successfully control a tariff classification of imported merchandise by using certain language in cataloguing the same. Of course, proper catalogue designations ofttimes are helpful in arriving at the trade understanding, but they are never conclusive proof of the facts asserted.

In *Austin, Nichols & Co.* v. *United States*, 6 Ct. Cust. Appls. 9, T. D. 35249, the following observation is made with reference to catalogs:

*  *  * We think that the so-called catalogues are designed solely to give information to the trade concerning the supplies carried and the prices at which they may be purchased.   At all events, they furnish no evidence whatever of·any intention to classify vegetable products according to table use, and in our opinion are utterly valueless as evidence of commercial designation.

After a careful consideration of the entire record, we are convinced that the plaintiff has failed to establish a *prima facie* case.   All claims in the protest are, therefore, overruled.   Judgment will be rendered accordingly.